ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
(ROME DIVISION)

FILED IN CLERK'S OFFICE
Rome

DEC - 8 2006

_____, Clerk
Deputy Clerk

| | |
|---|---|
| BR-111 IMPORTS & EXPORTS, INC., d/b/a<br>BR-111 EXOTIC HARDWOOD FLOORING<br>12800 NW 107th Court<br>Medley, Florida 33178<br><br>    Plaintiff,<br><br>v.<br><br>SUMMIT MARKETING, INC.<br>1000 Abutment Road<br>Dalton, Georgia 30721<br><br>SERVE ON:<br>ROBERT G. MCCURRY, ESQUIRE<br>The McCurry Law Firm, LLC<br>402 N. Selvidge Street<br>Dalton, Georgia 30722<br><br>    Defendant. | 4:06-CV- 255<br><br>CIVIL ACTION NO. _____ |

## COMPLAINT

Plaintiff, BR-111 Imports & Exports, Inc., d/b/a BR-111 Exotic Hardwood Flooring ("BR-111"), by its attorneys, brings this action against Summit Marketing, Inc. ("Summit"), and for cause states as follows:

### PARTIES

1. BR-111 is a Maryland corporation maintaining its principal place of business at 12800 NW 107th Court, Medley, Florida 33178, and transacting business in this judicial district through the same and additional offices.

2. Summit is a Georgia corporation with its principal place of business at 1000 Abutment Road, Dalton, Georgia 30721.

906966.9 12/7/06

## JURISDICTION AND VENUE

3.  Jurisdiction exists pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and complete diversity of citizenship exists. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs. Immediate injunctive relief is sought pursuant to Federal Rule of Civil Procedure 65(a). Venue is proper in this judicial district under 28 U.S.C. § 1391(a)(3).

## THE FACTS

4.  BR-111 is in the business of the manufacture and sale of exotic hardwood flooring.

5.  Summit is engaged in the business of, among other things, designing, engineering and constructing sample displays, sample materials, and other marketing-related items.

6.  In or about June 2005, BR-111 entered into a business arrangement with Summit. Pursuant to the parties' agreement, BR-111 would ship its hardwood flooring product (the "Property" or the "Product") to Summit's warehouse location in Dalton, Georgia. Summit would store the Property in its warehouse and construct hardwood floor display models that were then shipped, at the direction of BR-111, to BR-111 customers and dealers. These shipments were made pursuant to separate purchase orders placed by BR-111's customers. As each order was placed, BR-111 would communicate the shipping destination of the display and Summit would arrange for shipping and assembly of the displays. Summit would then render a bill to BR-111 for the agreed upon rate and BR-111 would pay the bills.

7.  The agreement between the parties required BR-111 to pay approved invoices within thirty (30) days of invoicing. BR-111 has always paid its obligations to Summit within terms. On most occasions, BR-111 has paid in a shorter period of time when Summit was

delayed in sending invoices to BR-111, or when Summit requested payment earlier to support its cash flow. In fact, to help Summit fund the start-up of its display assembly business, BR-111 advanced Summit One Hundred Thousand Dollars ($100,000.00) as evidenced by the attached payment history. BR-111 unilaterally offered to wire funds to Summit and has wired such funds to Summit at its own expense for every payment made since September 2005 to help Summit's cash flow. In addition, before Summit involved a factoring company, BR-111 paid invoices within one to two weeks of the date of the invoice, to further assist Summit's needs.

8. Summit is owned by two shareholders, Danny G. Simmons, Summit's Chief Executive Officer, and who owns fifty-one (51%) of the company, and Mike Volheim, Summit's former President, who owns forty-nine (49%) of the company. Mr. Volheim was responsible for establishing Summit's relationship with BR-111 and has at all times relevant to this matter been BR-111's primary point of contact.

9. Beginning in or about April 2006, BR-111 entered into discussions with Mr. Volheim regarding a proposal under which BR-111 would acquire, through Mr. Volheim, Mr. Simmons' shares in Summit for $750,000, subject to satisfactory completion of due diligence.

10. In or about August 2006, and before completion of BR-111's due diligence, Summit determined that approximately 2,500 shipped and installed display units would more likely than not need to be "retrofitted" with a strengthening device, and that the display units would need to be redesigned due to the collapse and/or destabilization of approximately 300 display units and due to instability on carpeted surfaces. For example, on one of these occasions, which occurred in September 2006, a unit collapsed, injuring a salesperson who was rushed to the emergency room. In another incident that occurred that same month, an infant was pushed out of the way of a collapsing unit, which weighed approximately 1,400 lbs. While there are

various reasons that have led and contributed to the collapse of the display units, it was determined that Summit had not properly labeled and instructed recipients of the display how to safely move the units once they were assembled. The labeling and instructional failures have led to the collapse of many display units.

11. In light of the uncertain financial risks and exposure to liability noted above, along with other business reasons, on October 30, 2006, BR-111 gave notice by electronic mail ("e-mail") to Mr. Volheim that BR-111 had decided to terminate all negotiations and discussions regarding an acquisition of shares of Summit's stock. In that same message, BR-111 also informed Summit that it was terminating its business relationship with Summit and requested that Summit cease all production of flooring samples beyond certain specified limits. BR-111 offered to reimburse Summit for the cost of any components which BR-111 could use in its business, and thanked Summit for the relationship over the last eighteen (18) months.

12. Subsequent to the October 30, 2006 cancellation, on November 9, 2006, BR-111 informed Summit by e-mail that a logistics company, hired by BR-111, would be at the Summit warehouse in Dalton on Monday, November 13, 2006, to begin moving BR-111's Property from the warehouse.

13. On Monday, November 13, 2006, BR-111's logistics company arrived at Summit's warehouse to begin retrieving BR-111's Property. Summit refused to allow BR-111's logistics company access to the Property in the warehouse. The truck driver waited several hours outside of the warehouse until BR-111 instructed him to leave.

14. On Tuesday, November 14, 2006, Summit's attorney informed BR-111's attorney by letter dated November 14, 2006, that Summit was asserting a special lien of bailee for hire of labor and services on the Property in the warehouse in the amount of Seven Hundred Fifty

Thousand Dollars ($750,000.00), and that Summit was refusing to return the Property to BR-111. As of December 5, 2006, Summit alleges that BR-111 owes Summit $191,726.48. BR-111 disputes this contention and believes that the amount of open invoices with which BR-111 concurs subject to inspection and verification, is no more than $92,601.42. Of the alleged open invoices of $191,726.48, only $940.00 relates to work actually performed on the Product.

15. As of the time this Complaint was filed, BR-111's Property being held by Summit had a retail value of approximately Two Million Dollars ($2,000,000.00). As of the end of September 2006, approximately seventy percent (70%) of the Property had not been unpacked or worked on by Summit, and BR-111 believes that ratio holds true today. Mr. Volheim recently informed David M. Burke, Chief Financial Officer for BR-111, that as of November 15, 2006, more than fifty percent (50%) of the Property at the warehouse remained unopened and untouched by Summit.

16. BR-111 has suffered, and will continue to suffer, substantial harm due to Summit's refusal to release the property in the warehouse until the alleged amount of money due is paid. BR-111 has suffered, and will continue to suffer, substantial harm due to Summit's refusal to release the Property in the warehouse. Specifically, BR-111 is three hundred display units back-ordered from new and existing dealers and expects to place an additional 400 displays on top of this within the next three weeks due to the launch of two new major distributors. Therefore, BR-111 needs its product to build the display units. Every day that Summit refuses to release BR-111's product, BR-111 consequently loses sales and its goodwill, and its reputation in the hardwood flooring industry is at risk. Such harm will continue to occur on a daily basis until the Property is released to BR-111.

## COUNT I
### (Conversion)

17. The allegations of Paragraphs 1 through 16 are incorporated by reference herein.

18. BR-111 and Summit agreed that BR-111 would entrust its Property with Summit and Summit would store the Property in its warehouse and convert the Property into displays. Summit was also entrusted to then, at the direction of BR-111, deliver completed sample display units to BR-111 customers and distributors.

19. Accordingly, Summit lawfully gained possession of BR-111's Property as a bailee.

20. On Monday, November 13, 2006, BR-111 made an unequivocal demand on Summit to release control of the Property and allow BR-111 to recover said Property.

21. BR-111 owns and has legal title to the Property.

22. Summit is in actual possession of the Property.

23. On Monday, November 13, 2006, Summit refused to release control of the Property or return the same to BR-111.

24. By refusing BR-111's demand for return of the Property, Summit has intentionally, willfully, and maliciously breached its duties as bailee of BR-111's Property and has converted the Property.

25. Summit claims that it is entitled to exercise complete dominion over all of BR-111's Property, valued at over two million dollars ($2,000,000.00) pursuant to a special lien codified in Georgia Code Annotated § 44-14-409.

26. Summit is not entitled to the lien claimed because no debt exists that relates to the Product. BR-111 is current in all of its obligations to Summit and should not be able to assert a lien on Property on which it has performed work.

27. Summit also cannot assert a lien over the Property on which Summit performed

no work, and cannot retain a quantity of Property whose value exceeds any possible claim by Summit against BR-111.

28. Furthermore Summit cannot assert a lien because the agreement provides for credit, and no lien may be asserted where the parties relied on credit instead of a lien.

29. Summit has interfered with BR-111's right to control the Property and as a direct and proximate consequence of such breach of Summit's duties as bailee, BR-111 has suffered and will continue to suffer irreparable harm and loss.

WHEREFORE, BR-111 Imports & Exports, Inc., d/b/a BR-111 Exotic Hardwood Flooring respectfully requests that this Court:

i. Grant BR-111 judgment and order Summit to relinquish control of the Property and return the same to BR-111, or in the alternative;

ii. Grant BR-111 judgment and order Summit to relinquish control of the Property and permit BR-111 to recover possession of the Property, or in the alternative;

iii. Grant BR-111 judgment for damages for the fair market value of the Property converted at the time of the conversion;

iv. Grant BR-111 judgment for consequential damages in an amount to be determined at trial, but no less than Five Hundred Thousand Dollars ($500,000.00); and,

v. Award BR-111 its reasonable attorney's fees, interest and costs incurred in this matter.

## COUNT II
### (Recovery of Personal Property - Trover)

30. The allegations of Paragraphs 1 through 29 are incorporated by reference herein.

31. Defendant Summit is in possession of property generally described as hardwood flooring product.

32. The Property has a retail of over Two Million Dollars ($2,000,000.00).

33. BR-111 claims title to said Property.

34. Summit lawfully gained possession of BR-111's Property as a bailee.

35. On Monday, November 13, 2006, BR-111 made an unequivocal demand on Summit to release control of the Property and allow BR-111 to recover said Property.

36. Summit wrongly refuses to allow BR-111 to recover Property and refuses deliver said Property.

Wherefore, BR-111 Imports & Exports, Inc., d/b/a BR-111 Exotic Hardwood Flooring respectfully requests that this Court enter judgment against Summit and grant BR-111 recovery of its Property.

## COUNT III
### (Injunctive Relief)

37. The allegations of Paragraphs 1 through 36 are incorporated by reference herein.

38. By virtue of the foregoing, BR-111 has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendant.

39. Unless Defendant is ordered to release BR-111's Property immediately, BR-111 will be irreparably harmed by:

  a) Loss of sales of its hardwood flooring products;

  b) Damage to existing supplier relationships due to product shortages; and

  c) Loss of dealer and customer confidence, trust, goodwill and loss of business reputation.

40. BR-111 has no adequate remedy at law.

Wherefore, BR-111 Imports & Exports, Inc., d/b/a BR-111 Exotic Hardwood

906966.9 12/7/06

Flooring respectfully request that:

    i.    A Temporary Restraining Order and/or Preliminary Injunction issue immediately, requiring Defendant to relinquish all BR-111 Property immediately to BR-111's possession;

    ii.    Other and such further relief as this Court deems necessary.

## COUNT IV
### (Breach of Contract)

41.    The allegations of Paragraphs 1 through 40 are incorporated by reference herein.

42.    As part of its services to BR-111, Summit interviewed, evaluated and recommended to BR-111 two companies to assemble the units once they arrived at their final destination. Summit subsequently contracted with these companies on BR-111's behalf. Pursuant to the contract, Summit was responsible for the design, assembly and construction of the displays, as well as instructions and warnings regarding how to safely move the displays.

43.    On numerous occasions, Summit's displays collapsed due to inadequate warnings and instructions regarding how to safely move the unit once assembled.

44.    In an effort to correct what appeared to be a warning defect and to restore customer confidence in the displays, Summit developed and recommended that a retrofit be applied to approximately 2,500 shipped and installed displays in order to strengthen the display to withstand normal usage. Additionally, BR-111 undertook an expensive mailing campaign to customers regarding safe methods for moving the displays. As a direct result of the collapsing units, Summit also redesigned the unit.

45.    The agreement between the parties required Summit to design and build safe, effective displays, with appropriate instructions and warnings, of the hardwood flooring product. Summit failed to do so and BR-111 has suffered harm as a result.

Wherefore, BR-111 Imports & Exports, Inc., d/b/a BR-111 Exotic Hardwood Flooring demands judgment against Summit Marketing, Inc. in the amount of One Million Dollars ($1,000,000.00), plus reasonable attorney's fees, interest and costs.

### JURY DEMAND

Plaintiff, BR-111 Imports & Exports, Inc., d/b/a BR-111 Exotic Hardwood Flooring ("BR-111"), by its attorneys, hereby requests a jury demand in its action filed against Defendant, Summit Marketing, Inc..

Respectfully submitted,

By: _____
Frank A. Lightmas, Jr. (Bar No. 452325)
Lightmas & Delk
Suite 1150, The Peachtree
1355 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel: 404-876-3335
Fax: 404-876-3338

Attorneys for BR-111 Imports & Exports, Inc.,
d/b/a BR-111 Exotic Hardwood Flooring

Of Counsel:
George F. Ritchie
Andrea D. Somerville
Saul Ewing LLP
500 E. Pratt Street
Baltimore, MD 21202
(410) 332-8600